**H. Douglas MILLER, Plaintiff,**

v.

**CAMPBELL COUNTY, WYOMING; Campbell County Commissioners, Bill Barkley, Thomas Ostlund, and Mickey Wagensen, Defendants.**

No. C88–0194J.

United States District Court, D. Wyoming.

Oct. 2, 1989.

Gary Shockey, Jackson, Wyo., for plaintiff.

John Young, Gillette, Wyo., Rick Thompson, Cheyenne, Wyo., for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

ALAN B. JOHNSON, District Judge.

The plaintiff, H. Douglas Miller, seeks damages under Section 1 of the Ku Klux Klan Act of 1871, 42 U.S.C. Section 1983, for alleged deprivations of his civil rights under the Fourteenth Amendment to the United States Constitution. The case arose after county officials discovered that lethal gasses, hydrogen sulfide and methane, were seeping into the Rawhide subdivision where the plaintiff owned a home. The gasses, evidently, were also seeping into the homes located in the subdivision. The subdivision is located in Campbell County, Wyoming, and is adjacent to a large open pit coal mine owned by Amax Coal Company.

The plaintiff and other persons owning homes in the subdivision previously sued Amax in this court under various tort theories, alleging that Amax's mining operations caused the dangerous gasses to seep into their homes thereby causing them injuries to their property and persons. The court dismissed that action on April 26, 1989, because of a settlement reached by and between the parties. Miller is now suing Campbell County and its commissioners, alleging that the commissioners violated his constitutional rights when, in response to the gas problems, they voted to pass a resolution that ordered the property owners of the Rawhide subdivision to evacuate their homes.

The county discovered the presence of dangerous gasses in the subdivision in February 1987. After consulting with federal and state agencies concerning health and safety problems posed by the gas seepage, the Wyoming Department of Environmental Quality (DEQ) conducted drill tests that confirmed the presence of methane and hydrogen sulfide gasses. In response to the problem, the county commissioners passed two resolutions declaring the Rawhide subdivision uninhabitable and ordered, by their first resolution, that some residents evacuate their homes by July 3, 1987.

The defendants passed the first resolution on June 2, 1987, and attempted to order a permanent evacuation of the subdivision on or before July 31, 1987. The resolution calling for a permanent evacuation however was soon rescinded. On June 3, the governor of the state of Wyoming declared the Rawhide subdivision a disaster area and thereby activated the state emergency operation plan to help coordinate the emergency assistance to persons living in the Rawhide subdivision. In response to a drilling program conducted by the DEQ within the subdivision, the county commissioners passed a second resolution on July 3, 1987, ordering the immediate evacuation of those persons residing near the drilling sites, which included the plaintiff. This is the resolution about which the plaintiff now complains.

The commissioners passed it after determining that the DEQ's drilling augmented the gas danger to the Rawhide residence. To enforce this order, the commissioners ordered that the Campbell County Sheriff's Office erect supervised road blocks at the entrances to the evacuated parts of the subdivision. The county therefore physically deprived the plaintiff, at least temporarily, of all use of his property.

The plaintiff, who operated a small business in his home, refused to leave until July 6. He initially refused to leave unless the county had compensated him for lost business income. After attending a meeting with the county commissioners the next

day, on July 7, the plaintiff attempted to return to his home, but was arrested by sheriff deputies when he traveled through a barricade to the entrance of the subdivision. The plaintiff spent the night in jail and was released the following day.

He then filed this action, alleging that the county and its commissioners deprived him of his liberty and property interests without due process of law in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The defendants have moved for summary judgment on the ground they are entitled to both qualified and absolute immunity.

■ The civil rights statute under which the plaintiff sues provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory for the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunity secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit and equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To prevail under § 1983 the plaintiff must show he was deprived of a federally secured right by someone acting under color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Wise v. Bravo*, 666 F.2d 1328, 1331 (10th Cir.1981). Action under state law includes a "[m]isuse of power, possessed by virtue of state law, and made possible only because the wrongdoer is clothed with the authority of state law." *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961).

It is well established that § 1983 does not create substantive rights, but merely provides remedies for deprivation of rights established elsewhere. *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). Thus violation of a state law ordinarily is not cognizable under § 1983. It is cognizable, however, when a state law supplies the basis for a constitutional right,—for example, where state law creates a property right that the fourteenth amendment protects, such as the right to own real property. *Davis v. Scherer*, 468 U.S. 183, 193, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). It is, of course, axiomatic that the due process clause of the fourteenth amendment requires that the states employ fair procedures in effecting a deprivation of property. *Williamson County Regional County Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 205, 105 S.Ct. 3108, 3126, 87 L.Ed.2d 126 (1985) (Stevens, J. concurring); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Melton v. City of Oklahoma City*, 879 F.2d 706 (10th Cir.1989).

In a § 1983 action the plaintiff initially must show that the conduct about which he complains was committed by a person acting under color of state law and that the conduct deprived him of rights, privileges, or immunities guaranteed by the constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). It is undisputed that in passing the resolutions at issue, the defendants acted under color of law. They hold their positions as county commissioners by virtue of state law and as such are in positions of considerable authority. Thus the court must focus on whether the defendants deprived the plaintiff of a federally secured right, the second prong of the test articulated by *Parratt*. The plaintiff asserts that the defendants' resolution requiring that he evacuate his residence deprived him of property without procedural due process of law because presumably it was passed without any notice to him and an opportunity for him to be heard.

Generally, the right to procedural due process under the fourteenth amendment requires that the state provide adequate

notice and a hearing "at a meaningful time and in a meaningful hearing" prior to the deprivation of a property right. *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). "Ordinarily, due process of law requires an opportunity for some kind of hearing prior to the deprivation of a significant property interest." *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978). *See also Hodell v. Virginia Surface Mining and Reclamation Association*, 452 U.S. 264, 299, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981); *Fuentes v. Shevin*, 407 U.S. 67, 81–82, 92 S.Ct. 1983, 1994–95, 32 L.Ed.2d 556 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 378–79, 91 S.Ct. 780, 786–87, 28 L.Ed.2d 113 (1971). There are, however, two exceptions to this general rule requiring predeprivation procedural due process.

The first exception is where the deprivation of property is the "result of a random and unauthorized act by a state" actor, who, through negligence, deprives someone of a federally secured right. *Parratt*, 451 U.S. at 541, 101 S.Ct. at 1916. In *Parratt*, the court held that this type of deprivation does not violate one's procedural due process rights absent a showing that post-deprivation procedures for redress are inadequate or "that it was practicable for the state to provide a predeprivation hearing." 451 U.S. at 543, 101 S.Ct. at 1917. In *Parratt*, state prison guards negligently lost an inmate's personal property, making it impossible to provide a predeprivation hearing. *Parratt* therefore is inapplicable here because the actions of the defendants were deliberate and calculated as opposed to random and unauthorized.

The second exception to predeprivation procedural due process is where an emergency exists requiring the state to take summary action. The taking of property without prior notice and an opportunity to be heard does not violate due process where the deprivation is the result of summary governmental action taken in emergencies and designed to protect the public health, safety and general welfare. *Sina-*

*loa Lake Owners Association v. City of Simi Valley*, 864 F.2d 1475, 1482 (9th Cir. 1989) (citing *Hodel*, 452 U.S. at 299–300, 101 S.Ct. at 2372–73; *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 677–80, 94 S.Ct. 2080, 2088–90, 40 L.Ed.2d 452 (1974); *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599–600, 70 S.Ct. 870, 872–73, 94 L.Ed. 1088 (1950); *Yakus v. United States*, 321 U.S. 414, 442–43, 64 S.Ct. 660, 675–76, 88 L.Ed. 834 (1944); *North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315–21, 29 S.Ct. 101, 104–06, 53 L.Ed. 195 (1908). Thus, for example, in *North American Cold Storage*, the Supreme Court upheld the city of Chicago's right to seize and destroy unwholesome food without a predeprivation hearing because the right to procedural due process was outweighed by the city's police powers to protect the public health in the face of an emergency posed by the potential distribution of unwholesome food. 211 U.S. at 315–16, 29 S.Ct. at 104. In that situation, post-deprivation due process was sufficient because the property owner could later sue those responsible for the deprivation and receive damages if the defendants failed to show that the food was in fact unwholesome and therefore subject to seizure. *Id.* Ordering the evacuation of a neighborhood because of the danger posed by the presence of admittedly lethal gasses appears to fall within the emergency action exception. In deciding this issue, the court looks first to see whether the plaintiff has adequte post-depravation remedies.

The present case is very similar to a series of cases that arose in South Dakota. In *Poage v. City of Rapid City*, 431 F.Supp. 240 (D.S.D.1977), property owners sued the city under section 1983 after the city bulldozed plaintiff's building, which had been damaged in a flood disaster. The city and county destroyed the building under its police powers, which they invoked under South Dakota's Emergency Disaster Act,[1] the provisions of which are identical in many relevant instances to the Wyoming

---

**1.** S.D. Codified Laws Ann. §§ 33–15–1 to 33–15–44.

Disaster and Civil Defense Act.[2] In that case the plaintiffs argued that seeking damages under § 1983 was their only realistic remedy because under the South Dakota Emergency and Disaster Act cities and counties had governmental immunity for any taking or damaging of private property done in the performance of civil defense activities.[3] The district court, however, abstained from deciding the issue because a separate case presenting the issue of governmental immunity under the same circumstances was pending before the state supreme court.

That case was *City of Rapid City v. Boland*, 271 N.W.2d 60 (S.D.1978). As in *Poage*, the plaintiffs sought compensation for the value of their home, which the city destroyed pursuant to its police powers after it summarily determined that the house, which had been damaged in the same flood as in *Poage*, was a public nuisance, presenting an imminent danger to the public health, safety, and welfare. In deciding whether political subdivisions had governmental immunity for taking or destroying property during the performance of civil defense functions, the South Dakota Supreme Court construed a provision of the state's civil defense act, which was *in hoc verba* with a parallel provision in Wyoming's Disaster and Civil Defense Act.[4] The court found that the statute, allowing for the taking or destroying of private property during emergencies, was nonetheless limited by the state's constitution, which, like Wyoming's, contained just compensation and due process clauses.[5] The court held that the relevant provision in the

state's Civil Defense Act, § 33-15-38, which is *in hoc verba* with Wyo.Stat. § 19-5-113(a)(i), only grants immunity under limited circumstances. Relying on the state's constitution as well as the holding in *North American Cold Storage v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), the court held that the statute granted immunity only when the defendants could establish that the property was destroyed or taken to prevent an imminent public catastrophe or to abate a public nuisance.

Although the Wyoming Supreme Court has never ruled on this issue, the court finds that the plaintiff has an adequate post-deprivation remedy. The Wyoming Constitution, like South Dakota's, prohibits the taking and damaging of private property for a public or private use without just compensation. Wyo.Const. art. 1, § 33. It also prohibits the taking of property without due process of law. Wyo.Const. art. 1, § 6. Additionally, Wyoming allows for inverse condemnation actions "when a person possessing the power of condemnation takes possession of or damages land in which he has no interest....". Wyo.Stat. § 1-26-516 (1981). A person prevailing under this statute is also entitled to litigation expenses. Here the county is a person possessing the power of condemnation and would therefore be subject to an inverse condemnation action. Wyo.Stat. § 1-26-801 (1988). The court is compelled to conclude that the plaintiff has not been deprived of a federally secured property right because the defendants took his property during an emergency for which

**2.** Wyo.Stat. §§ 19-5-101 to 19-5-116 (1977).

**3.** S.D. Codified Laws Ann. § 33-15-38. That statute provided:
All functions under this chapter and all other activities relating to civil defense are hereby declared to be governmental functions. Neither the state nor any political subdivision thereof, nor other agencies, nor, except in cases of willful misconduct, gross negligence, or bad faith, any civil defense worker complying with or reasonably attempting to comply with this chapter, or any order, rule or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision

of this state, shall be liable for the death of or injury to persons, or damage to property, as a result of such activity.
This statute is identical to Wyo.Stat. § 19-5-113(a)(i) (1977) of Wyoming's Disaster and Civil Defense Act.

**4.** Wyo.Stat. § 19-5-113(a)(i).

**5.** Art. VI, § 13 of the South Dakota Constitution provides "private property shall not be taken for public use, or damaged, without just compensation...." Article VI, § 2 of that state's constitution provides that "no person shall be deprived of life, liberty or property without due process of law."

the state of Wyoming plainly provides an adequate post-deprivation remedy.

In his brief, the defendant asserts that the emergency exception rule is unavailable to the defendants because there was in fact no emergency. The plaintiff's assertion, however, is belied by his prior complaint against Amax Coal Company, where in his amended complaint he alleged that "since the presence of gas is in *significant amounts* was noted in early 1987, the plaintiffs have suffered damages in the form of property losses, *personal injuries,* and consequential emotional injuries. The combined actions of the defendant [Amax Coal Company] have resulted in a total devaluation of all property values in the Rawhide subdivision and surrounding areas." According to the complaint in the prior lawsuit, the residents of the Rawhide subdivision began to notice in early 1987 "significant seepage of methane and hydrogen sulfide gasses from the ground *into* and around *their residences.*"[6] *Id.* (emphasis supplied). By July 1987 another poisonous gas, hydrogen selenide, also was confirmed to be seeping from the ground into the subdivision. In their opposition to Amax's motion for summary judgment, the plaintiffs argued "that as a group the emotional distress suffered by Rawhide residents has surpassed that of the victims of some of our country's best known technological disasters." Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 20. *Miller v. Amax,* C87-0300. Finally, in their final pretrial memorandum the plaintiffs stated as follows:

> The situation was intolerable for Rawhide residents. On February 26, 1987, the Campbell County Commissioners ordered the evacuation of several homes along the southernmost street in the subdivision, Salt Box Lane. Further evacuations were ordered in early March. These evacuations were based on the recommendations of county and state officials, as well as *Mr. Chester McKee, one of the expert witnesses for Amax* in this

case. Rawhide residents were experiencing increased rates of physical illness and extreme psychological stresses. Throughout March, April, and May, county, state, and federal officials contemplated further evacuation of the subdivision. County health officials, as well as county engineering and fire officials, all concluded that there were fire, explosion, and health hazards throughout the subdivision.

In the face of these allegations of which the court has taken judicial notice it is difficult to understand plaintiff's position that no emergency existed requiring an evacuation of the Rawhide subdivision. In any event, if no emergency existed, the plaintiff is no doubt entitled to damages in a post-deprivation proceeding in state court. As noted in *North American Cold Storage,* the defendants clearly have the burden of showing in a post-deprivation action that an emergency in fact existed.

Alternatively, the plaintiff argues that even if there was an emergency, the county commissioners lacked the police power to order an evacuation. In Wyoming, a county is a political subdivision "of the state created to aid in the administration of government and is not a sovereign entity" and has only those "powers expressly granted by statute or *reasonably implied* from powers granted." *Haddenham v. Board of County Commissioners of Carbon County,* 679 P.2d 429, 431 (Wyo.1984) (citing *Hyde v. Board of County Commissioners of Converse County,* 47 Wyo. 101, 31 P.2d 75 (1934)). The state of Wyoming has inherent police powers to protect the public health, safety, and welfare, which it clearly may delegate to its political subdivisions. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Schoeller v. Board of County Commissioners of the County of Park,* 568 P.2d 869, 876-77

---

**6.** Hydrogen sulfide is "a colorless flammable very poisonous gas H2S that has a disagreeable odor suggestive of rotten eggs...." Webster's Third New International Dictionary of the English Language Unabridged (3d ed.1976). Hydrogen selenide is also a poisonous gas. *Id.* Methane, on the other hand, is a gas that becomes explosive when mixed with air or oxygen. *Id.*

(Wyo.1977) (counties have those police powers delegated to them expressly or impliedly by the state constitution or legislature).

The plaintiff asserts that a county, through its commissioners, has only those powers specifically enumerated in Wyo. Stat. § 18–3–504(a). Those powers include those necessary to care for county property, to settle all accounts, to construct and maintain county buildings, appropriate and levy taxes, to exercise eminent domain for public roads and to grant licenses for ferries, toll bridges, and toll gates. Wyo.Stat. § 18–3–504 (1977). County commissioners also have those powers prescribed by law. Wyo.Stat. § 18–3–504(a)(viii).

■ The defendants argue that the Wyoming Disaster and Civil Defense Act grants broad police powers to political subdivisions to protect the public health, safety, and general welfare in times of emergencies. Wyo.Stat. §§ 19–5–101 to 19–5–116 (1977). The Act contemplates "joint participation by local, state, and federal governments in emergency and disaster services." *Boland v. City of Rapid City*, 315 N.W.2d 496, 500 (S.D.1982) (interpreting South Dakota's Emergency and Disaster Service Act, which is virtually patterned *in hoc verba* after Wyoming's Disaster and Civil Defense Act). By implication Wyoming's Disaster and Civil Defense Act grants broad police powers to counties to enact measures protecting the public in times of disasters. It provides in relevant part that "any political subdivision ... complying with or reasonably attempting to comply with [the Civil Defense Act], or any order ... promulgated ... pursuant to ... *precautionary measures enacted by any political subdivision of the state* is not liable for the death of or injury to persons or for damages to property as a result of the activity...." Wyo.Stat. § 19–5–113(a). A county is a political subdivision.[7] This provision provides governmental immunity to counties for damages arising out of their activities relating to the performance of civil defense functions.[8] Without limitation those functions include the following:

> The coordination of firefighting services, police services, medical and health services, rescue, engineering, attack warning services, communications, radiological defense, *evacuation of persons from stricken areas*, emergency welfare services, (civilian war aid), emergency transportation, existing or properly signed functions of plant protection, temporary restoration of public utility services, and other functions related to civilian protection, together with all other activities necessary or incidental to the preparation for any carrying out of the foregoing functions....

Wyo.Stat. § 19–5–102(a)(i) (emphasis added). A disaster includes those caused by natural causes. *Id.* The Act also grants broad police powers to the governor overseeing its provisions any time the disaster goes beyond local control. Wyo.Stat. § 19–5–104. Thus, the Act anticipates that counties at times will initiate civil defense functions independently of the governor. The court concludes that counties have emergency police powers under the Wyoming Civil Defense Act, which clearly include the power to order an evacuation of an area within the county stricken by a disaster of natural causes such as the seepage of lethal gasses.

## TAKING CLAIM

■ The plaintiff also appears to assert a taking claim under the just compensation clause of the Fifth Amendment to the United States Constitution, which is made applicable to the states by the fourteenth amendment. To the extent the plaintiff asserts such a claim, the court finds that it is without subject matter jurisdiction to adjudicate it because the claim clearly is not ripe. *See Sinaloa Lake Owners Association*, 864 F.2d at 1480 (ripeness is a jurisdictional requirement). A taking claim under the fifth amendment is not ripe until the plaintiff has received a final determina-

---

7. Wyo.Stat. § 19–5–102(a)(iv).

8. "All activities relating to disaster and civil defense are governmental functions." Wyo.Stat. § 19–5–113(a).

tion from the agency responsible for an alleged regulatory taking and has sought compensation through state procedures. *Williamson County Regional Planning Commission,* 473 U.S. at 194–95, 105 S.Ct. at 3120–21. Although the first requirement may be inapplicable here, in that there is no longer an order prohibiting the plaintiff from returning to his home, he nonetheless has not satisfied the second prong requiring that he exhaust state remedies. In this case, the defendant prevented the plaintiff from returning to his home for a few days. It is doubtful that a temporary taking of this duration is compensable. *But cf. First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987) (temporary taking for period of years is compensable).

## LIBERTY INTEREST

■ The plaintiff was arrested by sheriff deputies when he traveled through a roadblock in attempting to return to his home. The plaintiff asserts that he was deprived of his liberty interest in violation of the fourth amendment. Section 1983 provides a remedy against state actors who deprive a person of a constitutionally protected liberty interest without due process of law. *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). An individual's right to be free from an unlawful arrest and imprisonment implicates a constitutionally protected liberty interest the deprivation of which may be vindicated by § 1983. *Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir.1987). Under the fourth amendment, made applicable to the state by its incorporation into the fourteenth amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), a person has the right to be free from an arrest absent probable cause. *Baker,* 443 U.S. at 142, 99 S.Ct. at 2693; *Motes,* 810 F.2d at 1059. *See also Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (unconstitutionally effected arrest vindicated by § 1983).

■ In this case the plaintiff was arrested by sheriff deputies after traveling through a barricade placed at the entrance of the stricken subdivision. The plaintiff, however, is not suing the deputies, but the county and its commissioners. It is therefore attempting to impose liability on these defendants for the acts of others.

Although "Congress did intend that municipalities and other local government units to be included among those persons to whom § 1983 applies," *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978) (emphasis in original), such liability can be imposed only after a showing that "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. at 2036. In *Monell,* the court rejected respondeat superior as a basis for a municipal liability under Section 1983, concluding that "a municipality cannot be held liable *solely* because it employs a tortfeasor...." *Id.* (Emphasis in original). Otherwise stated, "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the *municipality,* and thereby make clear that municipal liability is limited to action for which the *municipality* is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (emphasis in original) (this quote comes from Part 2(A) of the opinion, joined by five justices). A municipality is liable for acts that it has sufficiently sanctioned or ordered, *Id.* rendering local governmental entities subject to suit under § 1983 where the action alleged to be unconstitutional implements or executes policy, ordinance, regulation, or a *decision* officially adopted and promulgated by the bodies of its officers. A single incident of unconstitutional activity is not sufficient to impose liability under *Monell* absent proof that the incident was caused by an existing, unconstitutional policy attributable to a municipal policy maker. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion). Here the county can be held liable if the plaintiff can show that his arrest grew out of an unconstitutional policy adopted by the county.

*Monell*, 436 U.S. at 661 n. 2, 98 S.Ct. at 2020 n. 2 (city policy forcing women employees to take maternity leave before medically necessary). Thus it would appear that the plaintiff is attempting to impose liability on the county on the ground that it formally adopted an unconstitutional policy requiring that he evacuate his home.

It would also appear that the individual county commissioners could be held liable for the acts of sheriff deputies provided there was some showing of an "affirmative link between the occurrence of various incidences of public misconduct and the adoption of any plan or policy by the [defendants]—express or otherwise[ ]showing their authorization or approval of misconduct." *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). These defendants potentially can be held liable under § 1983 for the acts of a sheriff deputy where they were "in a position of responsibility, knew or should have known of misconduct, and yet failed to act to prevent future harm." *McClelland v. Facteau*, 610 F.2d 693, 698 (10th Cir.1979). The plaintiff appears to be alleging the defendants are liable because they were "in a position of responsibility, knew or should have known of misconduct, and yet failed to act to prevent" the harm to him. *McClelland*, 610 F.2d at 697.

Assuming the plaintiff has established either one of these theories, the court must nonetheless determine whether the plaintiff's arrest was in violation of his fourth amendment rights. Under Wyoming law a person commits a misdemeanor if he travels through a roadblock that is supervised by a uniformed peace officer. Wyo.Stat. § 6–15–205 (1982). In his deposition, the plaintiff stated that he traveled through a road block that was supervised by two uniformed sheriff deputies. Although it is disputed how far he traveled past the road block it is certain he did so in the presence of uniformed officers. The officers undeniably had probable cause to arrest the plaintiff upon observing his committing a misdemeanor. His arrest therefore was constitutional.

## SUBSTANTIVE DUE PROCESS

█ The plaintiff also asserts that "in ordering evacuation, the defendants violated his substantive due process rights." The fourteenth amendment embodies a substantive due process component, which encompasses a broad concept of liberty such as "the right to enjoy 'generally those privileges long recognized at common law as essential to the orderly pursuit of happiness of free men.' " *Ingraham v. Wright*, 430 U.S. 651, 671, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)). Substantive due process guarantees a right to be free from intrusion on personal security " 'through means so brutal, so demeaning and harmful as literally to shock the conscience.' " *Garcia v. Miera*, 817 F.2d 650, 655 (10th Cir.1987), *cert. denied, Miera v. Garcia*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980)). Substantive due process also protects us "against arbitrary governmental action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate." *Sinaloa Lake Owners Association*, 864 F.2d at 1483). It has long been established that arbitrary and capricious state action affecting property rights may violate substantive due process. *Village of Euclid*, 272 U.S. at 395, 47 S.Ct. at 121.

█ To prevail on a substantive due process claim, the plaintiff must show that the action in ordering an evacuation of his property was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Id.* at 395, 47 S.Ct. at 121. In *Sinaloa Lake Owners Association*, the Ninth Circuit recognized the potential for due process violations when a state exercises emergency police powers. The court stated as follows:

> The exercise of emergency powers is particularly subject to abuse. Emergency decision-making is, by its nature, abbreviated; it normally does not admit participation by, or input from, those affected;

judicial review ... is often greatly curtailed or non-existent. Exigent circumstances often prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrained governmental action.

864 F.2d at 1486. In determining whether such a violation has occurred, the court adopted the following test:

[i]n determining whether the constitutional line has been crossed, a court must look to such factors as the need for the [governmental action], the relationship between the need and the [action taken], the extent of [damage] inflicted, and whether [the action was taken] in a good faith effort ... or maliciously ... for the very purpose of causing harm.

*Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)).

Here, the plaintiff concedes that lethal gasses were seeping from the ground into and around the homes of the subdivision. The evacuation was ordered after the DEQ's drilling in the subdivision increased the risk of exposure to hydrogen sulfide gas, the breathing of which could cause death or serious injury. Under these circumstances the temporary evacuation order appeared rational and substantially related to the public health and safety. As noted, the evacuation order was in effect for the duration of the DEQ's drilling. The plaintiff was allowed to return to his home within a few days so that the damage appears minimal, particularly since the county paid the plaintiff's lodging expenses incurred as a result of the county's evacuation order. There is no evidence that the action was taken in bad faith or maliciously for the purpose of causing harm, but rather all the evidence is to the contrary.

## ABSOLUTE IMMUNITY

Even assuming the plaintiff asserts tenable claims under § 1983, the individual defendants contend they are entitled to absolute legislative immunity. In *Lake County Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), the Court expanded absolute immunity to include regional legislators, holding that individual members of a regional planning commission were absolutely immune from damages under § 1983 to the extent they caused a deprivation of civil rights while acting in a legislative capacity. A majority of the circuits has since held that this immunity extends to members of local legislative bodies as well. *See Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 577 (9th Cir.1984); *cert. denied, City of Burbank v. Cinevision Corp.*, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985); *Abraham v. Pekarski*, 728 F.2d 167 (3d Cir.1984); *cert. denied, Pekarski v. Abraham*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822; *Reed v. City of Shorewood*, 704 F.2d 943 (7th Cir.1983); *Espanola Way Corp. v. Meyerson*, 690 F.2d 827 (11th Cir.1982); *cert. denied, Meyerson v. Espanola Way Corp.*, 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983); *Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir.1981); *cert. denied, Lafayette v. Hernandez*, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Bruce v. Riddle*, 631 F.2d 272 (4th Cir.1980); *Gorman Towers v. Bogoslavsky*, 626 F.2d 607 (8th Cir. 1980). *See also Ditch v. Board of County Commissioners of County of Shawnee*, 650 F.Supp. 1245 (D.Kan.1986) (finding that the Tenth Circuit would extend absolute immunity to local legislative bodies).

The plaintiff does not dispute that this is the majority rule, but he argues that absolute immunity is unavailable here because in issuing evacuation resolutions, the defendants were acting in a non-legislative capacity. The court finds that it need not decide the issues underlying absolute immunity because it is clear that these defendants are entitled to good faith qualified immunity.

## QUALIFIED IMMUNITY

■ As officials performing discretionary functions, the defendants are entitled to assert qualified immunity from this lawsuit. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Defendants are entitled to immunity from liability for civil damages under § 1983 "insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The court's holding in *Harlow* focused on the defendant's objective good faith, which "involves a presumptive knowledge in respect for 'basic, unquestioned constitutional rights.'" *Id.* at 818, 102 S.Ct. at 2738 (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975)).

The plaintiff has the burden of establishing that the constitutional rights allegedly violated were clearly established. *Pueblo Neighborhood Health Centers v. Losavio,* 847 F.2d 642 (10th Cir.1988). The plaintiff merely asserts that under *Harlow,* the defendants are not entitled to qualified immunity because the law is clearly established that a person cannot be deprived of property without due process of law or arrested absent probable cause. In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the court recognized that applying *Harlow* "at this level of generality bear[s] no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow.*" If this were the test the "plaintiff would be able to convert the rule of qualified immunity that our cases plainly established into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Thus, the plaintiff must do more than identify in the abstract a clearly established right of which he was allegedly deprived. Rather, he must show that the contours of the right "were sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* In other words, the "question is whether a reasonable official could have believed his conduct lawful in light of clearly established law and the information the officer possessed." *Id.* 107 S.Ct. at 3040.[9]

The plaintiff has not shown there was clearly established law prohibiting the defendants' actions and as the court has found the law is to the contrary. The defendants were confronted with an emergency of potentially life-threatening proportions. Under the Wyoming Disaster and Civil Defense Act reasonable county officials could have believed they had police powers to protect the public safety by ordering an evacuation of an area stricken by deadly gasses. The act does not require a predeprivation hearing and the law in general does not require one when the state acts to avert an imminent catastrophe. Based upon the status of the law and the information possessed by these defendants, the court must conclude that a reasonable official in their position would not understand that what he was doing violated a right. Assuming they did violate constitutional rights, which this court already has found they did not, the defendants would nonetheless be entitled to qualified immunity.

In accordance with this opinion, IT IS HEREBY ORDERED that summary judgment be GRANTED in favor of all of the defendants on all of the plaintiff's claims against them.

---

9. In *Anderson,* the plaintiff brought a civil rights action against police officers and FBI agents for allegedly violating his fourth amendment rights, after the defendants entered and searched his home with neither a warrant nor exigent circumstances. On the qualified immunity issue the court stated, "It simply does not follow immediately from the conclusion that it was firmly established that a warrantless search not supported by probable cause and exigent circumstances violate the fourth amendment that [defendant's] search was objectively legally unreasonable." 107 S.Ct. at 3039.